**IN THE DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**Danny and Sarah Campbell,
Joshua and Melissa Powell,
Richard and Tana Tolley,
and all others similarly situated,**
        **Plaintiffs,**

**vs.**                                          **Case No.**  __3:16-cv-08696_____
                                          **Honorable Judge _____**

**Virginia Meadows, LLC,
Cornerstone Customs, Inc.,
Old Colony Company, D.B.A. Old Colony, Realtors,
A.K.A. Old Colony,
MercyBuilt, LLC,
Jordan Garnes, A.K.A. Drew Garnes,
Brad Garnes,
Richard Garnes,
Linda Garnes,
Woodland Designs, Inc.,
Richlin Investments, LLC,
Jimmy Calhoun, D.B.A. Calhoun Engineering and Surveying,**
        **Defendants.**

## LIMITED FUNDS CLASS COMPLAINT

### I.  FACTS

This case is a tragedy of epic proportions.  An entire neighborhood in our community was constructed without any standards save one, *cheap*.  This standard that demanded only cheap resulted in the 30 plus families of the Virginia Meadows subdivision having homes that are swampy and wet both in the yard and in the foundations.  Cracks are forming throughout these young houses for a myriad of reasons, not the least of which is that they were all built on expansive soils without any soil testing, remediation or adequate drainage.  The framer did not use a level in his construction resulting in numerous homes which may be off level. The

1

electrician was never supervised by a master's electrician and designed the electrical systems of most of the homes without the required license.  The electrician also does not know how to do load calculations and upon information and belief did none for any of the houses.  Most of the houses have electrical issues including constantly blowing bulbs, breakers that throw constantly, and even lights that do not go off when the main breaker is thrown.  The general contractor for most of the homes, Mr. Drew Garnes, has limited to no construction experience and relied only on faith that his builders would build safe homes to the state building code.  Upon information and belief, Mr. Garnes feels no responsibility to supervise his employees' construction, and in fact, is still building with many of the same subcontractors he used in Virginia Meadows with in a new subdivision in Putnam county.  He did this while also acting as the seller's real estate agent through Old Colony, Realtors, a company that, according to its owner, does not exist, and receiving a kickback on the commission of nearly every single house sold in the neighborhood. For many of the residents, Mr. Garnes was the dual agent, hiding his poor construction from the very folks he owed a duty to disclose as a real estate professional.  For a few purchases, Mr. Garnes in his capacity as the purchaser's dual agent; advised them that a home inspection was unnecessary as it was new construction.

The houses have no roof felt or eve protection, no house wrap, and some do not even have foundation drains.  The ones that have foundation drains were not wrapped with drain cloth and are full of mud and stopped working long ago.  The houses have interior rated GFCI outlets in the outdoor outlets, poor insulation, carpet that is pulling up, wet OSB where the framer did not do any flashing around the doors and windows, sinking foundations where they sit in clay, and, in a few homes, the sewer lines run through and in the cold air returns of the HVAC systems.  The houses have no double joists under heavy loads like upstairs bathtubs. The walls of

many of the homes do not sit on the foundation at all, but on the decorative and cheap brick veneer in complete contravention of the building code.  The plumber cut huge three and four inch holes through the middle of the joists to run the sewer drains, and in a number of houses, huge half-moon notches sometimes leaving only a few inches of board were cut in the floor joists to install the HVAC ductwork.

These corners were cut to rake in huge profits for the Garnes family and Mr. Garnes, who was vice-president of the Putnam County Planning Commission while many of these construction defects were being installed in his homes.  Upon information and belief, Mr. Garnes profited to the tune of around $100,000 per home.  This sad travesty harmed the lives of dozens of families, and for what?  A few extra bucks on the house.

## II.  <u>FACTS</u>

### A.  <u>FACTS COMMON TO THE ENTIRE CLASS</u>

#### i.  <u>Background Facts</u>

1.  The Plaintiffs are all residents of the state of West Virginia.

2.  The following additional individuals have already expressed a desire to be members of the class and have retained Klein and Sheridan, LC:  Laruen Banks, Mark and Valarie Board, Thomas and Michelle Burnside, Albert Carr, Rita Coyle, Dennis and Sonya Day, Anthony Eggleston, Christopher and Amanda Hagy, Jonathan and Lori Halstead, Andrew and Melissa McClain, Kandi Heath, Jean Parsons, Steven and Dawn Petry, Chris and Amy Runyan, Georgiana Vannatter, James and Anne Wilt, and Dana Womack.

3.  The construction projects covered by this case are only the houses constructed by Jordan Drew Garnes, Brad Garnes, their parents in Virginia Meadows, the companies Cornerstone Customs, Virginia Meadows, MercyBuilt, Old Colony, Realtors, and/or

Woodland Designs, in the state of West Virginia.

4. The Plaintiffs and class members are persons who fall under the protection of the West Virginia Consumer Credit and Protection Act (herein "WVCCPA") and are entitled to the remedies set forth in Article 5 of the WVCCPA.

5. Most of the class members and their homes are located in Putnam County, West Virginia, including all of the class representatives.

6. Upon information and belief, the Defendants Jordan Drew Garnes, Brad Garnes, Cornerstone Customs, Virginia Meadows, MercyBuilt, Old Colony, and Woodland Designs are residents of the state of West Virginia or are corporations with their principle places of business in West Virginia.

7. West Virginia has adopted a statewide building code through the state Fire Marshall's office.

8. This statewide building code is the minimum safety standard for residential construction throughout West Virginia.

9. All builders must build to the minimum safety standards of the statewide building code regardless of whether or not there is enforcement in a particular locality.

10. Upon information and belief, Mr. Garnes is an owner of the companies and Defendants Cornerstone Customs, LLC and Virginia Meadows, LLC.

11. Upon information and belief, Mr. Garnes is a realtor with the Defendant Old Colony Company, D.B.A. Old Colony, Realtors.

12. In or about 2008, Jordan Drew Garnes, requested approval from the County Planning Commission to build a neighborhood in what now is called "Virginia Meadows" in Putnam County, West Virginia.

13. Virginia Meadows is located just outside of the Hurricane city limits.

14. Upon information and belief, Jordan Drew Garnes, Brad Garnes, and the other Defendants took no soil samples on the property to determine what kind of soil the neighborhood had.

15. Upon information and belief, the entire neighborhood is built on expansive soils which shrink and expand based on the moisture content of the soil.

16. Virginia Meadows abuts Interstate 64 on the highest part of the property.

17. Virginia Meadows is downhill from Interstate 64.

18. Upon information and belief, the Defendants installed no systems to deal with water runoff from Interstate 64.

19. Upon information and belief, the neighborhoods on the immediate left and right of Virginia Meadows also abut Interstate 64 on the back of the neighborhoods.

20. Upon information and belief, the neighborhoods on the left and right of Virginia Meadows are also downhill from Interstate 64.

21. Upon information and belief, both neighborhoods to the left and right of Virginia Meadows have large drainage pipe systems to manage runoff from Interstate 64.

22.  Upon information and belief, the Defendants' failure to install adequate drainage in the Virginia Meadows neighborhood is part of the reason why there is significant water accumulations in the yards, crawlspaces, and streets of the Virginia Meadows neighborhood.

23. Upon information and belief, none of the lots in Virginia Meadows were graded to insure water moved away from the foundations.

24. The Defendant, Jordan Drew Garnes, is or was, at all times relevant, a real estate agent

5

with Old Colony Company.

25. Upon information and belief, Jordan Drew Garnes was the real estate agent for Old Colony Company acting in the capacity of buyer, seller, or dual-agent for most of the properties sold in Virginia Meadows.

26. Real Estate agents have a duty to disclose material facts about the properties they are selling.

27. Real Estate agents have a duty to disclose defects he is aware of about the property.

28. Upon information and belief, prior to building Virginia Meadows, Jordan Drew Garnes had never worked for a builder or construction contractor of any kind.

29. Upon information and belief, prior to building Virginia Meadows, Jordan Drew Garnes had no training as a builder, carpenter, electrician, contractor, or from any other type of construction expert.

30. Upon information and belief, Jordan Garnes, in his capacity as a real estate agent, never disclosed his lack of experience and knowledge in construction or that of any of his family members.

31. Upon information and belief, Jordan Drew Garnes built all of the residences in Virginia Meadows without the supervision of an experienced contractor or builder.

32. Upon information and belief, Drew Garnes believes he has no responsibility to supervise the various subcontractors he hired to build in Virginia Meadows.

33. Upon information and belief, none of the Garnes' family made any attempt to inform buyers in Virginia Meadows that the Garnes' family would not be supervising the subcontractors that they were hiring prior to or during construction of the homes.

34. Upon information and belief, none of the Garnes' family advised any home purchases in

Virginia Meadows of the need to hire an outside expert to monitor the construction of their residence in Virginia Meadows.

35. Upon information and belief, Drew Garnes and Brad Garnes held themselves out to be competent general contractors capable of building homes and capable of supervising the construction of homes.

36. Drew Garnes is a realtor affiliated with Old Colony, Realtors, and his license is held by a broker with Old Colony, Realtors.

37. Upon information and belief, in his capacity as a realtor with Old Colony, Mr. Garnes received commissions from the sale of homes in Virginia Meadows as the selling agent.

38. Upon information and belief, Mr. Garnes acted as the dual agent for some of the residents purchasing homes in Virginia Meadows.

39. Upon information and belief, Old Colony, Realtors, received in excess of $100,000 in commission revenue from the sale of properties in Virginia Meadows.

40. Upon information and belief, Drew Garnes received a significant portion of the commissions received by Old Colony, Realtors, in Virginia Meadows.

41. Mr. Garnes advised some home owners that a home inspection was unnecessary because the house was new construction.

42. Mr. Garnes advised at least one couple not to get an independent realtor as it would require him to increase the purchase price of the home.

43. On that home, Mr. Garnes received the entire commission because one was never paid to Old Colony, Realtors.

44. Upon information and belief, at no point, while acting in his capacity as a realtor with Old Colony, Realtors, did Mr. Garnes advise any of the purchasers of homes in Virginia

Meadows that Mr. Garnes had no intention of following the ICC IRC 2009 or any other version of the statewide building code during his construction work in Virginia Meadows.

45. Upon information and belief, Mr. Garnes represents that he builds to the ICC IRC 2009 building code standard.

46. Upon information and belief, this representation was made both in Mr. Garnes capacity as a builder and in his capacity as a real estate agent for Old Colony, Realtors.

47. Upon information and belief, Mr. Garnes did not follow the statewide building code in his construction of Virginia Meadows.

48. Mr. Garnes did not substantially comply with the statewide building code in his construction of Virginia Meadows.

49. Mr. Garnes did not advise his sub-contractors that they needed to follow the statewide building code in Virginia Meadows.

50. The only drainage system for most of the neighborhoods is the streets and the yards.

51. There is no drain running down the middle of the neighborhood.

52. The residents only recently discovered Mr. Garnes' deceptions.

53. All of these issues were recently discovered or are still latent to the residents of Virginia Meadows.

54. Upon information and belief, Mr. Garnes did not have blueprints for most of the homes in Virginia Meadows.

55. Upon information and belief, Mr. Garnes did not have a licensed master electrician design the electrical systems for most of the homes in Virginia Meadows in violation of the building code and criminal laws.

56. Upon information and belief, Mr. Garnes has no training or experience as an architect or designer of custom homes prior to starting Virginia Meadows.

57. Upon information and belief, nearly all of the site preparation work conducted in Virginia Meadows, if any, is not in compliance with the statewide building code.

58. This is not an exhaustive list of the problems with the neighborhood as a whole.

59. Most of the class members sent twenty day notices to cure under 46A-6-101 et seq, and some of the notices to cure were on behalf of just the homeowner and some were on behalf of the homeowner and all similarly situated.

60. Mr. Garnes responded to all of the notices in one letter refusing to cure any of the defects in the home by pretending to not understand what the defects were or what the consumers wanted, i.e. their homes, fixed.

61. Upon information and belief, none of the Defendants used any of the notices required under §§ 21-11A-1 *et seq* to any of the class members and/or Plaintiffs in any of the written contracts with those individuals.

62. Upon information and belief, because none of the notices were provided pursuant to §§ 21-11A-1 *et seq,* Chapter 21-11A-1 *et seq* does not apply to this civil action.

## ii.   The Foundation

63. Upon information and belief, the lots in Virginia Meadows were not graded pursuant to the building code to keep water away from the foundations.

64. Upon information and belief, the foundations were not properly waterproofed.

65. Upon information and belief, the foundation drains were not wrapped nor do they sit in gravel all the way around the residences.

66. Upon information and belief, all of the foundation drains have quit working due to filling

with soil.

67. Upon information and belief, some of the residences have no foundation drains at all.

68. All of the houses have an HVAC system in the crawlspace under the houses.

69. Some of the houses have water heaters in the crawl space.

70. Many houses have water in the crawlspace.

71. Many of the houses have water inside the cinderblock foundation.

72. None of the houses have properly installed foundation straps or bolts.



73. Several of the sill plates in all of the houses do not touch the cinderblock foundation in large areas.

---

[1] 251 Prado Foundation Under Construction



74. A senior engineer from the International Code Counsel has represented in an email to Plaintiff's experts that it is unacceptable to build houses so that the external weight of the home sits on a brick veneer.

75. The West Virginia State Building Code also forbids building homes directly onto the brick veneer.

76. Brick veneer can only hold up the dead load of the brick veneer above it.

77. All of the houses have at least some sill plates directing all of the weight of that portion of the home onto the brick veneer.

78. Brick veneer is not allowed to have any weight on it except for the dead load of the brick veneer above it.

79. In some locations, the footers are not deep enough.

80. The general contractor and foundation contractor ignored the expansive soil or clay, and did not make any attempts to build the homes in a way that accounted for expansive soils.

81. Upon information and belief, the houses are off level.

82. A number of the houses have foundation cracks.

---

[2] 165 Prado sill plate sitting on the brick and missing the cinderblock.

83. A number of the houses have inadequate foundation piers, and some of the piers are starting to lean, especially the ones in standing water.

84. Some of the houses have cinderblock foundations that are starting to move.



85. The yards are wet to the extent they often cannot be adequately mowed in the summer time.

86. All of these issues were recently discovered or are still latent to the residents of Virginia Meadows.

87. Upon information and belief, nearly everything the mason did violates the statewide building code.

88. This is not an exhaustive list of the problems with the foundations.

### iii.   **The Framing**

89. Upon information and belief, the framer Mr. Garnes used, Kenny Watson, framed all or nearly all of the homes in Virginia Meadows.

90. Upon information and belief, Mr. Watson did not use a level in his framing construction.

91. Upon information and belief, Mr. Watson is not being able to build stairs.

92. All of the houses in Virginia Meadows are two stories.

93. Most of the residences have issues with the way the stairs were built, including unsafe

---

[3] 266 Prado Drive Cinderblock Moving Away from the Foundation Wall

drops, poorly installed railings, carpet bunching on the stairs, etc.

94. The framer installed the doors and windows prior to the house wrap going up.

95. The framer did not flash any of the doors or windows in Virginia Meadows.

96. The OSB around the doors and windows, where there is no flashing, is wet and slimy.

97. Upon information and belief, the framer did not use double joists under any of the bathrooms, stairs, or fireplaces as required by the Statewide Building Code.

98. Upon information and belief, the framer set some load bearing walls on OSB only between the floor joists.

99. The framer framed the house up so that many of the load bearing walls transferred their weight down only onto the decorative brick veneer in many spots.

100.       The framer did not follow the building code.

101.       Upon information and belief, the framer does not understand that statewide building code.

102.       Upon information and belief, the framer did not know how to properly install a foundation strap.

103.       Upon information and belief, the framer has no idea if the homes in Virginia Meadows are level.

104.       The second floor bonus room over the garage in many of the homes was constructed in a way that transfers all of the weight to a single two by four on each side of the beam.

105.       Most of the residences in Virginia Meadows do not contain house wrap.

106.       The statewide building code always requires at least one layer of water resistant house wrap.

107.     Some houses only have house wrap on a small portion of the house.

108.     Upon information and belief, none of the houses have house wrap on all of the surfaces of the house.



109.     Upon information and belief, none the houses were wrapped prior to the install of the doors and windows.



110.     Without flashing and by not installing the house wrap before installing the doors and windows, the house is subject to getting water on the OSB board around the doors and windows resulting in rot around the doors and windows:

---

[4] 165 Prado Missing House wrap
[5] 251 Prado with Doors and Windows Installed Before House Wrap

111.   The doors and window fins are not properly nailed in and the nails do not set into the studs one and a half inches, and, in some places, do not even set into the studs at all.

112.   Upon information and belief, 1 & ¼ inch nails were used for the window finds. Thus making it impossible for the nails to set into the studs an inch and a half because the nails are not that long.

113.   All of the houses have significant cracks, including a large crack over the doorway in nearly all of the houses over the master bath.

114.   All of these issues were recently discovered or are still latent to the residents of Virginia Meadows.

115.   Upon information and belief, nearly everything the framer did violates the statewide building code.

116.   This is not an exhaustive list of the framing problems in Virginia Meadows.

### iv.   The Electrical

117.   Upon information and belief, Virginia Meadows had at least two electrical subcontractors working in the homes.  Brett Covert after 2012, and Dean Venoy prior to 2012.

118.   West Virginia law requires a licensed electrician design the electrical systems for new construction.

119.   Mr. Venoy has a journeyman license.

120.   Upon information and belief, Mr. Venoy does not nor has he ever had a master electricians license.

121.   Upon information and belief, Mr. Venoy designed most of the electrical systems in Virginia Meadows despite this being a misdemeanor to design an electrical system

without a license to do so.

122.     Upon information and belief, Mr. Venoy was not supervised by a master

electrician in Virginia Meadows.

123.     Upon information and belief, Mr. Venoy did not have a master electrician review

his work in Virginia Meadows.

124.     Upon information and belief, Mr. Garnes did not have a master electrician review

the electrical work in Virginia Meadows conducted by Dean Venoy.

125.     Upon information and belief, the Garnes used the wrong gauge wiring for 20 amp

circuits in some of the wiring.

126.     Upon information and belief, the Garnes' put too many outlets on each circuit.

127.     Upon information and belief, the Garnes' put too many lights on each circuit.

128.     The residences in Virginia Meadows are constantly changing lightbulbs.

129.     Upon information and belief some of the lightbulbs in Virginia Meadows sockets

have scoring that indicates they melted in the outlets.

130.     Upon information and belief outlets which state "do not use in wet or damp

locations" on the side were installed in the exterior outlet boxes.

131.     Upon information and belief, the exterior outlet boxes were not sealed with

silicone to ensure they were waterproof.

132.     Upon information and belief, for some of the houses, Mr. Garnes himself wired

the post lights without a license.

133.     In some of the residences, the post lights have no conduit holding the wire going

to the post light.  In at least one house, the wire lays bare on the front lawn.

134.     Upon information and belief, the Garnes' electrical contractor, Mr. Venoy, had no

idea what a fire-break is.

135.     v Upon information and belie, the Garnes' electrical contractor, Mr. Venoy, did nothing to ensure that fire breaks, when drilled through, were filled with materials to prevent the movement of fires through the walls.

136.     Upon information and belief, the Garneses installed non-gfci outlets underneath bathtubs to provide electrical to Jacuzzi systems.

137.     Upon information and belief, the electrical systems in the Garnes' residences are fire hazards.

138.     Upon information and belief, it is a miracle nobody has been hurt yet in Virginia Meadows from a fire.

139.     All of these issues were recently discovered or are still latent to the residents of Virginia Meadows.

140.     Upon information and belief, all the work conducted by the electrician violated the statewide building code and the national electrical code.

141.     This is not an exhaustive list of the electrical problems in Virginia Meadows.

### v.     The Plumbing

142.     Upon information and belief, all of the plumbing in Virginia Meadows was conducted by Joshua Hughes.

143.     Upon information and belief, almost all of the homes in Virginia Meadows have or have had in the past significant plumbing leaks.

144.     Upon information and belief, the plumber installed the toilet flanges in the house using a nail gun and not bolts.

145.     Upon information and belief, in a number of the homes, the only thing holding

down the toilet flanges is the floor tile and some rusty nails.



146.     Upon information and belief, it is just a matter of time before the toilets in the house, often on the second floors of the homes, begin leaking gray water.

147.     Upon information and belief, the plumber drilled significant holes through middle of the floor and ceiling joists throughout the homes compromising their structural integrity.

148.     Upon information and belief, the Garneses did nothing to make sure that his plumber and framer worked together to make sure that the plumbing had a place to go that did not require wholesale destruction of the joists.

149.     Upon information and belief, the Garneses did not make sure the bathtubs sat properly on the OSB floor so that the bathtubs move up and down when stepped in or filled with water.

150.     Several of the houses have leaking sewer pipes.

151.     Several of the houses have sewer pipes running through the ventilation of the HVAC systems like this:

---

[6] 233 Prado Toilet Flange Installed with Rusty Nails and Leaking with Wet OSB

18



152.    All of these issues were recently discovered or are still latent to the residents of

Virginia Meadows.

153.    Upon information and belief, nearly everything the plumbing contractor did

included violations of the state building code.

154.    This is not an exhaustive list of the plumbing problems in Virginia Meadows.

vi.    **<u>The Roof</u>**

155.    None of the roofs in Virginia Meadows have roof felt under the shingles.

156.    Roof felt is inexpensive and prevents the OSB decking on the roof from getting

damage.

157.    Upon information and belief, roof felt is required for most roofs to have full

warranty coverage.

158.    Upon information and belief, all shingle companies require the builder follow the

statewide building code in order to honor the roof warranty.

159.    Upon information and belief, the lack of roof felt in Virginia Meadows means the

roofs all have shortened or no warranties.

160.    Upon information and belief, further, the lack of roof felt means the decking will

---

[7] 60 Prado Gray Water Pipe in HVAC

be exposed to water damage.

161.     Upon information and belief, water damage is already occurring in the roof

decking exposed to water.



162.     Further, the roofs have no eve protection to protect the eves of the roofs.

163.     Upon information and belief, he roofs were installed with high nailing in many

locations.

164.     High nailing will result in the roof not being attached correctly and may slide.

165.     The roofs will have to be replaced correctly.

166.     All of these issues were recently discovered or are still latent to the residents of

Virginia Meadows.

167.     Upon information and belief, nearly everything the roofing contractor did

included violations of the state building code.

168.     This is not an exhaustive list of the roofing problems in Virginia Meadows.

     vii.     **Other Issues Common to the Virginia Meadows Neighborhood**

169.     Most of the homes have significant concrete surface problems, including the

---

[8] 251 Prado Roof Intersection

driveway surfaces are breaking up and cracking.



170.     The garage floors in the houses nearly, universally, have cracks across the entire

floor.



171.     The Garnes, either themselves or at their direction, forced all of the foundation

drains that do exist to drain directly into the street in violation of county ordinances and

the building plan.

172.     The drainage plan for the neighborhood, as it is, does not adequately provide for

the drainage of the Virginia Meadows residences.

173.     Upon information and belief, the HVAC systems in all of the houses was installed

improperly and is not big enough for the residences.

---

[9] 110 Prado Driveway Crack
[10] 111 Prado Garage Floor Cracking Up

174.     All or nearly all of the houses have two small HVAC systems, one in the attic and one in the crawl space.

175.     A number of the homes have inadequate insulation with large sections of attic space completely uninsulated from the outside world.

176.     As a result of the inadequate insulation in a lot of attics, the houses are often very expensive to heat in the winter time.

177.     Hardwood flooring was installed in a sloppy fashion that resulted in gaps in the floors. The lack of trim and transitions in the house creates gaps between the hardwood flooring and carpet transitions and the walls.

178.     Most of the doors to the back decks of the homes include large gaps through which the outside is visible and significant drafts come through.

179.     Many of the homes have loose windows that move back and forth when pushed on.

180.     The loose windows may be the result of the framer not supervising his employees. He testified that sometimes when he did not supervise his employees they would sometimes fail to install the nails in all of the flange holes for the windows.

181.     In a number of the houses, the girders under the floors sit directly on cinderblock edges with no metal plate under them to protect them from cutting and turning in time.

182.     In a few houses, the girders are cracking with the cracks transferring through seams in the girder system from one girder board to another.



183.     One of the houses actually has a place in the back yard that is about the size of a

Volkswagen Microbus where it remains so swampy that cattails grow and the family

there has to burn things to keep the snakes and rodents out.

184.     Most of the houses have decks that are splitting and pulling apart.



185.     All of the families have some water problems and bug problems.

186.     Many of the homes have unsafe staircase transitions from the garage to the house

proper.

---

[11] 233 Prado Crack Transferring Through Seem in Girder

187.     The garage spigots are either leaking, have leaked, or have exploded in most of the houses.

188.     The fireplace inserts, in most of the houses, are loose and often do not work.

189.     This is not intended to be an exhaustive list of all of the problems with the residences in Virginia Meadows, and the Garnes' construction.

190.     This is not intended to an exhaustive list of building code violations for the Garnes', but instead to put them on notice of various systems that have problems throughout the neighborhood.

B.   **CLASS CLAIMS AND CLASS REPRESENTATIVES**

191.     Plaintiffs, pursuant to Rule 23(a) and Rule 23(b)(1)(B) of the West Virginia Rules of Civil Procedure, seek to represent the following class:

All persons who have purchased and currently own homes where Defendants provided contracting or real estate services in West Virginia in the last ten years ("Class").

192.     Plaintiffs request that the Court appoint and approve Danny and Sarah Campbell, Joshua and Melissa Powell, and Richard and Tana Tolley as the class representatives of the class ("Class Representatives").

193.     The identities of the members of the Class are ascertainable from the records of the Defendants and the property records in the counties where the houses were constructed.

194.     Each of the Class Representatives is a member of the Class.

195.     The Class and each Subclass are so numerous that joinder of individual members is impracticable as the members of the Class exceed fifty

196.     There are common questions of law and fact in this action that relate to and affect

the rights of the Plaintiffs and each Class member as the Defendants acted in concert in their construction of homes, their selection and use of the same subcontractors, and their affiliation with Drew Garnes as realtor with Old Colony, Realtors.

197.     The claims of the Class Representative are typical of the claims of all the other Plaintiffs and the class as a whole, as most of the Defendants used the same or similar shoddy and fraudulent construction techniques on the houses constructed for the Class and the Class Representatives.

198.     The Class Representatives are adequate to represent the interests of the Class. Each of the Class Representatives have been actively involved in investigating the claims and is committed to vigorously litigating the claims on behalf of the Class. The Class Representatives have retained competent counsel experienced in litigating class actions and complex civil cases.

199.     The Class Representatives seek to have certified a "limited fund" class action under Rule 23(b)(1)(B). Under that rule, "[a]n action may be maintained as a class action if the prerequisites of [Rule 23(a)] are satisfied and, in addition: (1) [t]he prosecution of separate actions by or against individual members of the class would create a risk of (B) [a] adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." W. Va. R. Civ. P. 23(b)(1)(B).

200.     The Defendants assets and available insurance coverage are limited such that there are insufficient funds available to class members to fully cover all claims.

201.     In this case, the totals of all aggregated claims once liquidated and the fund

available for satisfying them, set at their maximums, demonstrate the inadequacy of the fund to pay all of the claims as the total value of the liquidated claims is in excess of the available assets and insurance of the Defendants.

202.      Certification of a limited fund class pursuant to W. Va. R. Civ. P. 23(b)(1)(B) will permit the inadequate fund to be devoted to the claims of the Class.

203.      The claimants comprising the Class are identified by common theories of Recovery as set forth herein.

204.      Class certification will permit the Court to assure that all claimants to the limited fund are treated equitably among themselves.

205.      Finally, individual actions by Class members may be dispositive of the interests of other members not parties to the adjudication of the claim, which would impair or impede the ability of those individuals to protect their interests as individual actions could unfairly dissipate the fund to the prejudice of later claimants.

### COUNT I

#### *UNFAIR AND DECEPTIVE ACTS AND PRACTICES*

206.      The Plaintiff incorporates the previous paragraphs as if fully set forth herein.

207.      The Defendants violated § 46A-6-104, Unlawful acts or Practices of the *West Virginia Consumer Credit and Protection Act*.

    a.  Drew Garnes provided a service to the Plaintiffs in the form of general contracting services for construction.

    b.  Drew Garnes provided a service to the Plaintiffs in the form of a real estate agent.

    c.  Drew Garnes sold a consumer good, specifically a house to be placed on, real estate.

d.  Defendant Old Colony held out their agent, Drew Garnes, to be a competent and knowledgeable home builder.

e.  Drew Garnes held himself out to be a competent builder, and never disclosed that he would not be supervising his subcontractors.

f.  It was deceptive for Mr. Garnes not to inform his customers that he would not be supervising the subcontractors that Mr. Garnes was hiring.

g.  It was unfair for Mr. Garnes to fail to supervise the various subcontractors he selected to build the Plaintiffs' homes.

h.  It was both unfair and deceptive for Mr. Garnes to draft a contract for the sale of his own construction services in his capacity as a realtor for a customer that benefitted him to a high degree of profitability without providing for construction standards.

i.  It was unfair for Mr. Garnes to build his clients homes in a way that did not meet building code standards.

j.  It was unfair and deceptive of Mr. Garnes to hire an electrical contractor that did have the requisite licenses to design electrical systems.

k.  It was unfair of Mr. Garnes not to insist his subcontractors build to the building code standard.

l.  It was unfair and deceptive of the Garnes' to skimp on difficult to discover products that are required by the building code like roof felt, house wrap, proper wiring, proper plumbing, etc.

m.  In reliance on the representations made by Mr. Garnes, the Plaintiffs entered into a home construction contract with Mr. Garnes and the Defendants Cornerstone

Customs and Virginia Meadows, LLC, for the construction of their residential home.

n.   It was unfair and deceptive of the Garnes to fail to do any soil tests prior to construction and to ignore the existence of clay as they dug footers for homes.

o.   It was unfair and deceptive of the Garnes' to fail to install proper drainage in the neighborhood.

p.   It was unfair and deceptive of the Garnes to improperly install foundation drains.

q.   It was unfair and deceptive of the Garnes to do no surface prep of the lots to make sure water runs away from the foundations of the homes in Virginia Meadows.

r.   The Defendants, Mr. Garnes, Cornerstone Customers, and Virginia Meadows, LLC, hastily built a substandard home for Mr. and Ms. Campbell with significant defects in construction and workmanship as detailed in the fact section above.

s.   The water and drainage issues are causing structural problems which could either lead to very expensive repairs or cause the house to be unlivable.

t.   The foundation and structural issues could potentially create a dangerous situation.

u.   It was unfair and deceptive of Drew Garnes to receive compensation as a realtor for the residents of Virginia Meadows while hiding defects and building code violations he was personally aware of from folks buying in Virginia Meadows.

208.   As a result of the Defendant's actions:

v.   The homes the Plaintiffs purchased will require many thousands of dollars of repairs to bring it up to the state's minimum health and fire safety standards found in the statewide building code.

28

w.  The Plaintiffs may further be damaged in that the draining issues affecting their neighborhood may not be repairable, thus eventually making their home unlivable.

x.  The Plaintiffs may be unable to sell their home or may have significantly reduced equity due to the enormous number of value decreasing problems with the property and latent defects which would have to be disclosed to a potential buyer.

**COUNT II**

***BREACH OF THE IMPLIED WARRANTIES OF HABITABILITY AND FITNESS***

209.     The Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

210.     Defendants failed to construct Plaintiffs' homes in a workmanlike manner.

211.     Defendants did not exercise reasonable care and/or skill in the construction of the home.

212.     Plaintiffs' home suffers from a litany of ongoing issues and latent defects as a result of Defendants' poor workmanship.

213.     Defendants lack of care and skill have resulted in structural instability, from the foundation to roof; ongoing drainage issues; poor ventilation; improper installation of windows, doors, counters, flooring, and numerous other issues throughout the home, as set forth in the fact section above.

214.  As a result of the Defendants' actions, Plaintiffs have been financially harmed, their property value is diminished, and they have suffered many hours of worry and stress.

**COUNT III**

***COMMON LAW NEGLIGENCE***

215.     The Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

29

216.   Defendants negligently failed to train, supervise, monitor or otherwise control its employees and subcontractors to ensure that its employees competently constructed a home as described in the fact section above.

    a. The Defendants had a duty to ensure that Plaintiffs' new residences were constructed competently.

    b. The Defendants breached that duty by building a substandard house with significant structural problems.

    c. As a result of the Defendants' breach of duty, the Plaintiffs have suffered damages in the form of diminished value of their property and significant past, present, and future repair costs, much of which would have been unnecessary with a little site preparation and upfront work.

    d. It was within the scope of the risk that the Plaintiffs would suffer similar financial harm, stress, duress, and mental anguish as a result of the Defendants' poor workmanship.

    e. Defendants' poor workmanship has actually caused the Plaintiffs financial harm, stress, duress, and mental anguish as a result of the Defendant's poor workmanship.

217.   The Defendants have a responsibility to construct a home as a reasonably prudent builder would.

218.   The Defendant, Old Colony, negligently encouraged the use of Mr. Garnes services, as upon information and belief that Mr. Garnes was an agent employee of Old Colony.

219.   As a result of the Defendants' actions, Plaintiffs have been financially harmed, their property value is diminished, and they have suffered many hours of worry and

stress.

## COUNT IV

### *BREACH OF THE WARRANTY OF MERCHANTABILITY*

220.      The Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

221.      The Defendants represented that they could build a house to certain specifications and to meet certain standards, including the state building code.

222.      The Defendants further warrantied that the house would be free of defects.

223.      The house has more defects and problems than a mere mortal can list, although Plaintiffs have tried to list as many as they can.

224.      Some of the defects with the house are structural and present a danger to those who occupy the house, including significant structural risks due to the house not sitting on its foundation.

225.  As a result of the Defendants' actions, Plaintiffs have been financially harmed, their property value is diminished, and they have suffered many hours of worry and stress.

## COUNT VI

### *BREACH OF CONTRACT*

226.  The Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

227.  The Plaintiffs had a contract with the Defendants, Mr. Garnes, Cornerstone Customs, and Virginia Meadows, for the construction of a house with some specific custom instructions from the Plaintiffs.

228.  The Defendants, Mr. Garnes, Cornerstone Customs, and Virginia Meadows, failed to build the Plaintiffs' residence in a competent fashion as agreed to by the parties, and many aspects of the residence, such as the foundation, structure, plumbing, drainage,

window, door, countertop, and flooring installation, wiring, etc. need to be rebuilt or redone.

229.   As a result of the Defendants' breach of contract, the Plaintiffs have suffered damages, including a significant reduction in property value, and significant necessary repair costs.

## COUNT VII

### *BREACH OF EXPRESS WARRANTY*

230.   The Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

231.   The Defendants' and Bonded Builders did expressly warrant the residence to be free of certain defects.

232.   The house contains numerous defects as reviewed in the fact section above.

233.   Many of the defects in the house present a danger to those occupying the house, including significant foundation and structural concerns.

234.  As a result of the Defendants' actions, Plaintiffs have been financially harmed, their property value is diminished, and they have suffered many hours of worry and stress.

## COUNT VIII

### *BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING IN CONTRACT*

235.   The Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

236.   Defendants have a duty of good faith and fair dealing, which is implied in every contract, that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the benefit of their contract.

237.   The Defendants' and Bonded Builders did expressly warrant the residence to be free of certain defects.

238.   The Defendants breached their duty by building Plaintiffs' homes that contain

numerous defects as reviewed in the fact section above.

239.    Many of the defects in the house present a danger to those occupying the houses, including significant structural concerns.

240.    Defendants' breach of their duty of good faith was intentional, wanton and/or reckless.

241.   As a result of the Defendant's actions, Plaintiffs have been financially harmed, their property value is diminished, and they have suffered many hours of worry and stress.

## COUNT IX

### *BREACH OF FIDUCIARY DUTY*

242.    The Plaintiff incorporates the previous paragraphs as if fully set forth herein.

243.    Both the Plaintiff in this case and the seller were represented by the Defendant Old Colony, Realtors.

244.    Old Colony, Realtors, showed a preference for the Defendants Drew Garnes, Cornerstone Customs, and Virginia Meadows by taking the Plaintiff directly to Mr. Garnes over other possible home builders.

245.    As a result of this dual-agency relationship and the Defendant Old Colony showing a preference for one of their own builders, the Plaintiff was shown a preference by a trusted agent through Old Colony for a particular home builder, but the Plaintiff was not given an opportunity to search for or talk with other possibly more competent home builders.

246.    The home builder in this case was custom selected by Old Colony.

247.    The Defendant breached their fiduciary duty to the Plaintiffs by preferentially connecting them with their agent Mr. Garnes.

248.    The Defendant Drew Garnes, in his capacity as a realtor, breached his fiduciary duty to his customers and clients by failing to inform them that he was not going to build their

house to the statewide building code standard.

249.   The Defendant Drew Garnes, in his capacity as a realtor, breached his fiduciary duty to the Plaintiffs by failing to inform them that he was also the seller of the property and the builder and thus had a financial interest in the outcome of the sale of the property and construction services.

250.   The Defendant Drew Garnes, in his capacity as a realtor, breached his fiduciary duty to his clients by failing to advise his clients that they should insist on holding his construction companies to a particular standard.

251.   Upon information and belief, this is because Mr. Garnes did not want to himself, and his companies to be held to any standards.

252.   Mr. Garnes, in his capacity as a realtor, breached his fiduciary duty to his clients when he failed to insist all his clients get a home inspection.

253.   Mr. Garnes, in his capacity as a realtor, breached his fiduciary duty to his clients' every time he withheld a fact or failed to make a disclosure or suggestion that would be to his determent, but would be to the benefit of his clients.

254.   Mr. Garnes received compensation for his work as a realtor despite his vagrant disregard for his duties to his clients.

255.   Old Colony, as Mr. Garnes principle, is vicariously liable for all of Mr. Garnes actions as their agent, sometimes referred to as a real estate agent.

256.   As a result of the Defendant Old Colony's breach of fiduciary duty, the Plaintiff relied on the Defendant Old Colony's preferential treatment of their agent, Mr. Garnes, and a result was damaged significantly by her choice to have Mr. Garnes, Cornerstone Customs, and Virginia Meadows build her residence.

257.   Damages include the purchase of a home with significant and pervasive workmanship errors which resulted in a significantly reduced property value, significant possible repair costs, and has significant water draining buildup problems.

## COUNT X

***VIOLATION OF THE RACKETEERING AND CORRUPT ORGANIZATIONS ACT ("RICO")***

258.   The Plaintiff incorporates the previous paragraphs as if fully set forth herein.

259.   The Defendants, Jordan Garnes, Brad Garnes, through their companies, Virginia Meadows, Cornerstone Customs, MercyBuilt, Woodland Designs, and Richlin Investments, and Old Colony, violated RICO and the Plaintiffs were injured as a result.

260.   Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning 18 U.S.C. § 1961(3).

261.   Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

262.   Each Defendant violated 18 U.S.C. § 1962(d) by the acts described in the prior paragraphs, and as further described below.

263.   The Defendants form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

264.   Drew Garnes and his brother, Brad Garnes, along with their parents, Richard and Linda Garnes, both individually and through their respective companies, Virginia

Meadows, Cornerstone Customs, MercyBuilt, Woodland Designs, and Richlin

Investments, associated together and with Old Colony for the purpose of defrauding

homebuyers.

265. Alternatively, the Garnes-controlled companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

266. Alternatively, the Garnes-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

267. Each enterprise has engaged in, and their activities have affected, interstate commerce.

268. The Defendants associated together for a common purpose of engaging in a course of fraudulent conduct and are an association-in-fact RICO enterprise within the meaning of 18 U.S.C. 1961(4).

269. Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), 1962(c) and 1962(d). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

270. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

271. The acts of racketeering were not isolated but rather, the acts of Defendants were related, in that they had the same or similar purpose and result, participants, victims and

method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2009 and continuing to the present, and there is a continued threat of repetition of such conduct.

272.  Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and/or the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

273.  Defendants committed acts constituting indictable offences under 18 U.S.C. §§ 1341, 1343, and 1344 in that they devised or intended to devise a scheme or artifice to defraud homebuyers or to obtain money from homebuyers and/or financial institutions by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals. The acts of the Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

274.  Defendants could not have carried out their scheme without the use of the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Defendants communicated among themselves and with the

Plaintiffs in furtherance of the scheme to defraud Plaintiffs. Their communications were typically transmitted by wire (i.e. electronically) and/or through the U.S. mails or private or commercial carriers.

275.   Specifically, Defendant Drew Garnes used wires to induce Plaintiffs to execute contracts for the purpose of continuing Defendants' fraudulent scheme.

276.   Plaintiffs reasonably and justifiably relied upon Defendants' false representation, false pretenses and deceptive communications, and Plaintiffs have been damaged as a direct and proximate result of Defendants' participation in such enterprise, as alleged herein.

277.   The Defendants agreed, between and among themselves and in combination with each other and various agents identified herein, as to each overt act in furtherance of the conspiracy and enterprise, to engage in unlawful actions for a common purpose, to wit: to perpetrate a fraud upon Plaintiffs through fraudulent misrepresentations to induce consumers into purchasing unfit homes, in violation of 18 U.S.C. § 1962 (c) and (d).

278.   The Defendants formed the enterprise with the purpose of conducting a fraudulent scheme to sell unfit, worthless homes.

279.   The Defendants have acted in furtherance of the enterprises' purpose for a period of more than five (5) years.

280.   The various acts forming a pattern of racketeering are as follows:

   a.   Drew Garnes, and Brad Garnes, upon information and belief, have no training or experience in construction.

   b.   Drew Garnes and Brad Garnes, through their companies, developed a plan to develop a housing development in Hurricane, West Virginia called Virginia Meadows.

c.  Drew Garnes and Brad Garnes held themselves out to be competent general contractors.

d.  Drew Garnes was not a competent contractor and, in fact, had no idea how to build a house.

e.  Upon information and belief, Brad Garnes was also not a competent contractor and also had no idea how to build a house.

f.  Drew Garnes then became a realtor with Old Colony.

g.  Upon information and belief, Old Colony knew or should have known that Drew Garnes had no idea how to build a house.

h.  Drew Garnes would lure folks into purchasing his new construction by advertising through numerous sources, including Old Colony's website and the Multiple Listing Service.

i.  The Defendants would not disclose to any of the purchasers that their homes were built by sub-contractors, who those subcontractors were, or what their license numbers were.

j.  The Defendants' had a statutory duty under W. Va. Code § 21-11A-6.

k.  None of the Defendants provided their purchasers a description of the goods and services provided by each subcontractor, supplier, or design professional as required by W. Va. Code § 21-11A-6.

l.  Upon information and belief, none of the Defendants intended to comply with the West Virginia's Building Code, the ICC IRC 2009 and later editions, in the construction of any of the homes.

m.  Upon information and belief, none of the Defendants intended to comply with the

National Electrical Code, as adopted by the West Virginia Fire Marshall, including the NEC 2008 and later editions.

n.  The Defendant, Drew Garnes, acting in his capacity as a realtor for himself and for Brad Garnes, would intentionally not disclose known defects in the construction of the houses, including violations of the West Virginia Building Code, which were disclosed in the Bentley v. Virginia Meadows case, and in the expert reports, in that case, of David Tabor and Roy Sexton.

o.  The Defendant, Drew Garnes, would act as both the builder and the dual-agent real estate agent for the purchasers of many of the homes, through Old Colony Realty.  As the dual-agent, Mr. Garnes would actively discourage purchasers from getting home inspections, stating that home inspections were unnecessary because Mr. Garnes' construction was new construction.

p.  The Defendants did not disclose, to any of the purchasers, that they had no intention of supervising the subcontractors.

q.  The Defendants did not supervise any of the subcontractors at any time.

r.  Upon information and belief, the Garnes' and their companies, in conjunction with Old Colony, did not intend to build to the West Virginia Building Code or Electrical Code standards.

s.  Upon information and belief, the Garnes', their companies, and Old Colony, intended to subvert the building code with the intent to reduce costs and increase profits.

t.  Upon information and belief, Old Colony paid a kickback to the Garnes, in the form of a realtor commission, for the privilege of profiting off of the Garnes'

scheme to defraud consumers through the sale of sub-standard homes.

u.  Upon information and belief, Old Colony has made over one hundred thousand dollars in profits on the Garnes' construction scheme.

v.  Upon information and belief, the Garnes, their companies, and Old Colony conspired to build substandard homes for sale in Hurricane, West Virginia, market those products through the internet, mail, and otherwise, and then pocketed the enormous profits that resulted from cutting corners around the building code and electrical code.

w.  A number of the homeowners acquired mortgage loans to purchase properties from the Defendants only to find that the liens provided to the various mortgage companies are likely worth less than the original appraised value of the homes due to the depreciated value from the latent issues now impacting the homes' fitness.

281.  The racketeering acts committed by the Defendants constitute a pattern of racketeering activity within the meaning of 18 U.S.C. 1962 in that they are related to one another and are continuous. These racketeering acts are continuous in that they have occurred over a period exceeding two years, will continue into the future, and pose the threat of continuing for years.

282.  Upon information and belief, the Defendants continue to scheme to defraud consumers. To this day, the Defendants continue to misrepresent themselves as competent developers and skilled contractors to induce consumers into contracts.

283.  As a direct and proximate cause of the Defendants' violations of 18 U.S.C. § 1962 (c) and (d):

41

y.  The Plaintiffs purchased homes that will require many thousands of dollars of repairs to bring up to the state's minimum health and fire safety standards, as set forth in the statewide building code.

z.  The Plaintiffs may further be damaged in that the draining issues affecting their neighborhood may not be repairable, thus eventually making their home unlivable.

aa. The Plaintiffs may be unable to sell their homes or may have significantly reduced equity due to the enormous number of value decreasing problems with the property and the latent defects, which would have to be disclosed to a potential buyer.

### DEMAND FOR RELIEF

Plaintiffs demand from the Defendants:

a.  Actual damages for the violations of the WVCCPA as authorized by *West Virginia Code* §46A-5-101(1) for all such violations that occurred up to the date and time of the filing of this complaint;

b.  Statutory damages in the maximum amount authorized by *West Virginia Code* §46A-5-101(1) as adjusted for inflation pursuant to *West Virginia Code* §46A-5-106 for all such violations that occurred up to the date and time of the filing of this complaint;

c.  Plaintiffs' cost of litigation, including attorney fees, court costs and fees, pursuant to *West Virginia Code* §46A-5-104 and for Breach of Warranty;

d.  Plaintiffs' attorney's fees and costs for all fraud committed in Count V by the Defendants;

e.  The Plaintiffs be awarded general damages and incidentals for the Defendant's

negligence and breach of contract as alleged in Count III and VI of the Complaint;

f.   The Plaintiffs be granted general damages and punitive damages for Defendants' conduct alleged in Count II, IV, V, VI, VII, VIII, IX, X;

g.   Such other relief as the Court shall deem just and proper under the attendant circumstances.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

> **Danny and Sarah Campbell,**
> **and all others similarly situated,**
> BY COUNSEL

BY:   /s/ Benjamin Sheridan
      Benjamin M. Sheridan (# 11296)
      Daniel K. Armstrong (#11520)
      Mitchell Lee Klein (# 2071)
      *Counsel for Plaintiff*
      Klein & Sheridan, LC
      3566 Teays Valley Road
      Hurricane, WV 25526
      (304) 562-7111
      Fax: (304) 562-7115

      Anthony J. Majestro, Esq.
      WV Bar No. 5165
      Powell & Majestro, PLLC
      405 Capitol Street, Suite P-1200
      Charleston, WV 25301
      304-346-2889 / 304-346-2895 (f)
      amajestro@powellmajestro.com